UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| RICHARD L. BYERS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:13-CV-199 JD |
| | ) | |
| CAROLYN W. COLVIN | ) | |
| Acting Commissioner of the Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPINION AND ORDER</u>

Plaintiff Richard L. Byers applied for but was denied Disability Insurance Benefits by the Commissioner of the Social Security Administration. He then filed a complaint in this Court seeking review of that decision, and the matter has been fully briefed. For the following reasons, the Court GRANTS Byers' motion and REMANDS this matter to the Commissioner for further proceedings.

## I. PROCEDURE

On August 31, 2009, Byers applied for a period of disability and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, with an alleged onset date of January 7, 2009. (R. 130–33). After his application was denied, Byers requested a hearing before an ALJ, which took place on June 8, 2011. (R. 38, 80–81). ALJ Karmgard issued his decision on November 25, 2011, denying Byers benefits and finding that he was not disabled at any time after January 7, 2009. (R. 25–37). The Appeals Council denied Byers' request for review on January 1, 2013, rendering the ALJ's decision the final action of the Commissioner. (R. 4–10). Byers timely filed his Complaint [DE 1], and this Court has jurisdiction to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g).

## II. FACTS

Byers was born on July 28, 1958, and he was 52 years old at the time of the hearing. (R. 42, 130). Byers completed high school, and worked as an ironworker for 30 years before the onset of his alleged disability. (R. 43, 136).

### A. Medical Records

Byers' medical history of record begins on February 13, 2008, when he saw Sarah Sears, M.D., for his shoulder pain. (R. 226–27). Dr. Sears referred Byers for an MRI, which revealed a near complete, full-thickness, partial width, anterior to posterior tear of the anterior lateral supraspinatus in the rotator cuff and a tear of the superior labrum. (R. 227). On March 11, 2008, Byers saw Stephen Kollias, M.D., for an x-ray of his shoulder and spine. (R. 212). Byers complained of pain in his left shoulder into his left forearm that was relatively constant despite using prescribed Hydrocodone. (R. 212). He reported difficulty riding his motorcycle, working with his left arm away from his body and overhead, and rated his pain at an eight out of ten. (R. 212). Dr. Kollias noted that Byers' x-ray showed degenerative changes of the glenohumeral joint, and he prescribed a therapy regimen involving cervical traction and a shoulder program. (R. 213).

On May 2, 2008, Byers saw Joseph Riina, M.D., based on a referral from Dr. Kollias. (R. 205, 208). Byers reported pain in his left shoulder and numbness in his left fingers, and stated that both the pain and numbness were worse at the end of the day or with prolonged use. (R. 205). Byers also had neck pain, and tingling in the thumb, index, and fourth finger of his left hand. (R. 205). Byers reported he could sit for about fifteen minutes, and his leisure activities and work were affected by the pain. (R. 205). Dr. Riina noted that Byers had full range of motion in his cervical spine, and that Byers reported tightness and soreness in the back of his neck with extension. (R. 206). Dr. Riina further reported that Byers' left hand was weakened and he had

decreased sensation to light touch in his left thumb, index, and fourth finger, as compared to the right side. (R. 206).

On May 9, 2008, Byers saw Dr. Sears to discuss his medications and shoulder pain. (R. 232). He reported that his fingers were tingling, getting numb, and felt sorer all of the time, but he reported no neck pain. (R. 232). Dr. Sears renewed his Hydrocodone prescription and planned another EMG. (R. 232). Byers also saw Dr. Kollias the same day for an exam of his left arm and shoulder. (R. 203). Dr. Kollias reported that Byers' shoulder motion was "absolutely perfect," with forward elevation and abduction of 180 degrees, external rotation at his side to 80, internal rotation behind back to T-6, strength at five out of five, and a positive O'Brien's test. (R. 203). Byers' neck had weakness at C6–7, and he had constant pain in the axial of his arm. (R. 203). Dr. Kollias opined that the tingling and numbness in Byers' hand was "obviously" not related to the shoulder. (R. 203).

Byers first saw Robert Baltera, M.D., on June 24, 2008, for treatment of his left hand. (R. 282). Dr. Baltera's impressions included bilateral carpal tunnel syndrome and left cubital tunnel syndrome. (R. 283). Byers elected to undergo a "carpal tunnel release" on his left wrist and a decompression of the ulnar nerve on his left elbow. (R. 283). Dr. Baltera performed the procedures on July 25, 2008, without incident, and Byers was discharged with pain medication. (R. 289–90). Byers returned to Dr. Baltera on November 17, 2008, reporting shoulder pain that was waking him from sleep. (R. 280). Byers had a full range of motion in his shoulder, mild tenderness and pain over the AC joint, no significant crepitus, and strong external rotation against resistance. (R. 280). Byers elected to undergo surgery, and on January 7, 2009, Dr. Baltera performed an arthroscopic synovectomy, labral repair, acromioplasty, and distal clavicle

resection. (R. 286).[1] During the surgery, Dr. Baltera discovered that a large labral tear was present with instability in the biceps anchor, the anterior labrum, and the posterior/superior labrum. (R. 286). However, the rotator cuff and biceps tendon were intact. (R. 286). The surgeries were completed without complications and Byers was discharged with a prescription for pain medications and therapy. (R. 288). Byers began an occupational therapy regimen following the shoulder surgery, and he attended about 20 sessions from January 12, 2009 to June 6, 2009. (R. 296–317).

Byers saw Dr. Baltera for his first post-surgery follow up on February 2, 2009; he reported increased numbness since the surgery. (R. 279). Dr. Baltera believed that the numbness was due to swelling in his elbow and forearm, and his arm's position set by the shoulder immobilizer. (R. 279). X-rays were negative for anything other than triceps spurs. (R. 279). Byers was switched to an arm sling, continued on labral repair therapy, and given a prescription for Percocet. (R. 279). When Byers saw Dr. Baltera again on March 2, 2009, he had forward flexion to 110 degrees, and no external rotation, but he had not been working on that movement yet, and tests indicated severe right carpal tunnel syndrome. (R. 278). Dr. Baltera refilled Byers' pain medication prescription, told him to continue progressive exercises with his left shoulder, and opined that Byers "remains disabled from work." (R. 278).

Byers continued to attend therapy sessions. On March 2, Byers' pain was a six out of ten with pain medications, and the notes report that he remained extremely tight in all planes of the range of motion but that he was cleared for full range of motion. (R. 306). On March 10, he reported that pain made it difficult for him to sleep at night, that he had been sleeping on the couch, and that his pain was at an eight out of ten with pain medications. (R. 307). On March 24,

---

[1] The date of these surgeries is also Byers' alleged onset date of disability. (R. 141).

4

Byers reported that the more he used his hand the more it ached. (R. 309). He also reported that he was no longer waking up at night, that the pain was not constant, and that he rated his pain at a four out of ten. (R. 309).

Byers returned to Dr. Baltera on April 13, 2009, and he reported significant shoulder pain that was slowly improving, with increased numbness in his left hand. (R. 277). His range of motion in his left shoulder was slowly improving; he had a forward flexion to 120 degrees, but had significantly restricted internal and external rotation. (R. 277). Dr. Baltera instructed Byers to continue stretching his left shoulder to improve his range of motion and lessen his level of pain. (R. 277). Byers attended therapy session on April 20, and he reported shoulder pain at a six out of ten and right elbow pain at an eight out of ten. (R. 314). The progress notes state "Great improvement," and that the exercise program was getting easier overall. (R. 314).

On April 29, 2009, Dr. Baltera performed a carpal tunnel release on Byers' right wrist and a ganglion excision on Byers' right index finger. (R. 284). After the procedures, Byers was discharged with pain medication. (R. 285). At physical therapy on May 27, Byers reported he was able to ride his motorcycle, but that his shoulder was sore all the time. (R. 315). Byers reported that his range of motion with his shoulder increased after he took his pain medication. (R. 315). He rated his left shoulder pain between a four and a six out of ten, and his right hand pain at a two to three out of ten. (R. 315). The notes indicate that his progress significantly decreased (R. 315).

A follow up visit with Dr. Baltera on June 1, 2009, indicated that numbness and tingling in Byers' right hand had resolved since the surgery, and that his left shoulder was improving with full forward flexion but limited internal and external rotation. (R. 276). Byers' strength was slowly improving, but shoulder pain was waking him after about four hours of sleep. (R. 276).

Dr. Baltera opined that Byers remained "completely disabled from iron work[,]" but hoped that continued stretching and strengthening of the left shoulder would allow Byers to return to "full duty work" in six to ten weeks. (R. 276).

Byers' final physical therapy session took place June 1, 2009. (R. 316, 317). Byers rated his right hand pain at a zero out of ten, and rated his left shoulder pain at an average of three to four out of ten, but at a six out of ten at the end of the day. (R. 317). The notes indicate Byers would advance on a home strengthening program. (R. 317). His discharge prognosis for functional recovery was "Good." (R. 316).

On June 17, 2009, Byers presented to Dr. Sears with numbness in his left fingers, and stress and anxiety from his concern with his surgeries, job, and insurance. (R. 257). Dr. Sears prescribed Omeprazole and Lexapro, and set a follow up visit in six weeks. (R. 258). Byers returned to Dr. Sears on July 2, 2009, with complaints of numbness in the left hand and stiffness in both hands. (R. 259). His reported symptoms were musculoskeletal myalgias and depression. (R. 259). The physical exam indicated a normal range of motion without any joint swelling. (R. 260). Dr. Sears continued Byers on Lexapro for depression. (R. 260).

On July 13, 2009, Byers saw Dr. Baltera for post-surgery reevaluations. (R. 269). Dr. Baltera reported that Byers had no pain at rest, pain with increased activities, no significant crepitus, and full forward flexion. Dr. Baltera also noted that Byers' internal and external rotation were improving. (R. 269). Byers was not working at the time and Dr. Baltera opined that Byers still could not return to full, unrestricted work activities, but that he could return to work with a ten to twenty pound lifting restriction on the left hand and no use of the left arm above the shoulder level. (R. 269).

After applying for disability insurance benefits on August 31, 2009, Byers was examined by a state agency consultant and doctor. (R. 323, 329, 343). Byers underwent a mental status examination with John Heroldt, Ed.D., HSPP, on October 14, 2009. (R. 323). Dr. Heroldt noted that when he asked Byers what psychological limitations caused him to apply for disability, Byers stated, "'My shoulder.'" (R. 323). Byers stated to Dr. Heroldt that he had been depressed after his January 2009 surgery, beginning in March of 2009. (R. 323). Dr. Heroldt diagnosed Byers with Anxiety Disorder NOS (mixed anxiety-depressive disorder), and gave him a Global Assessment Functioning Score of 61. (R. 325).

On November 7, 2009, Byers was seen by Ihrar Paracha, M.D., upon referral by the state agency. (R. 343). Byers estimated he could only lift five to ten pounds with his left arm, walk half a mile before needing to sit down, climb two to three flights of stairs without difficulty, and stand for twenty minutes. (R. 343). Byers reported numbness and tingling in digits three, four, and five on his left hand since the January 2009 surgery, and he stated that he was told the numbness and tingling may be related to cervical neuropathy and not to the shoulder. (R. 343). Byers could not reach behind his back and had difficulty reaching overhead with his left arm. (R. 345). His gait was normal, he could walk on heels and toes, tandem walk, and squat without problems. (R. 345). Dr. Paracha reported that Byers had equal strength in each extremity and equal grip strength with either hand, that his fine finger skills were normal on both hands, and that the sensory exam showed a decreased sensation to fine touch on digits three, four, and five on the left hand. (R. 345).

On June 15, 2010, Byers saw John Arbuckle, M.D., for an initial consultation regarding on-and-off neck pain and tingling in his left thumb, index, and middle fingers. (R. 371). Dr. Arbuckle found that Byers' symptoms were on his left arm, but that his May 3, 2010, MRI

showed more significant findings on the right side. (R. 371). Dr. Arbuckle opined that the symptoms indicated clinical C6 or C7 left radiculopathy, and prescribed a Medrol Dosepak (R. 371). On July 2, 2010, Dr. Arbuckle gave Byers a C7–T1 epidural steroid injection. (R. 372). In his indications, Dr. Arbuckle noted that the previous injection was helpful for several weeks.[2] (R. 372). Byers returned on August 31, 2010 because he did not have any relief from the July 2 epidural. (R. 373). Dr. Arbuckle prescribed Byers Voltaren and Flexeril, and ordered a new EMG of his left arm. (R. 373).

On September 14, 2010, Byers saw Dr. Arbuckle again. (R. 374). Dr. Arbuckle started Byers on a prescription of Neurontin. (R. 374). Dr. Arbuckle stated that the May 3, 2010 cervical MRI did not indicate pathology explaining Byers' symptoms, but that he would bring Byers back in for a left C7 selective nerve root injection. (R. 374). Byers returned to Dr. Arbuckle for the C7 nerve root injection on September 28, 2010. (R. 375). Thirty minutes post-injection, Byers experienced improvement with his arm and neck pain, but still experienced residual shoulder pain. (R. 375). Dr. Arbuckle opined that because of the continued shoulder pain, he could not interpret the injection as absolutely positive. (R. 375).

Byers returned to Dr. Arbuckle on November 2, 2010. (R. 376). Byers' symptoms included left neck, shoulder, and arm pain. (R. 376). Dr. Arbuckle reviewed an October 18, 2010 CT scan, and stated that he did not think there was anything ongoing with Byers' cervical spine that explained his symptoms. (R. 376). Dr. Arbuckle opined that Byers may have some "residual things" secondary to his carpal and cubital tunnel diseases. (R. 376). Dr. Arbuckle restarted Byers on Neurontin and scheduled a follow up in four weeks. (R. 376).

---

[2] There are no office notes indicating when this other injection took place, and Dr. Arbuckle's report from June 16, 2010, indicates that Byers did not have any previous cervical spine injections. (R. 371).

**B.    State Agency Non-Examining Sources**

Joelle Larsen, Ph.D., reviewed Byers' records on October 19, 2009, to evaluate the severity and limiting effects of Byers' mental conditions. (R. 329). Dr. Larsen reported that Byers had mental impairments that fit under the 12.06 anxiety-related listing, but that they were not severe. (R. 329). Dr. Larsen opined that Byers had a mild degree of limitations in restrictions of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation. (R. 339). Dr. Larsen stated that Byers was credible per the medical evidence of record, but that his psychological restrictions were not significantly limiting. (R. 341).

J. Sands, M.D., completed a physical residual functional capacity assessment on November 12, 2009. (R. 348). Dr. Sands opined that Byers had exertional limitations restricting him to only occasional lifting of up to twenty pounds, of frequently lifting only ten pounds, of standing, walking, or sitting, with normal breaks, for up to six hours each in a normal eight hour day, and to pushing and/or pulling unlimited except for the same restrictions for lifting. (R. 349). Dr. Sands included postural limitations that restricted Byers from never climbing ladders, ropes, or scaffolds; only occasionally climbing ramps or stairs, stooping, kneeling, crouching, or crawling; the postural limitations allowed for frequent stooping. (R. 350). Manipulative limitations included limited reaching in all directions and limited feeling, occasional reaching overhead with the left arm, and occasional feeling with the left hand, but with no restrictions on the right hand and arm. (R. 351). Handling and fingering manipulations were unlimited with both hands. (R. 351). Dr. Sands found Byers' statements about his symptoms credible because Byers' medically determinable impairments could reasonably be expected to produce his alleged symptoms, his symptoms were not inconsistent with the objective findings in the record, and the

statements were further supported by the general consistency in Byers' description of his symptoms in the progress notes and other evidence. (R. 353).

**C.    Byers' Testimony at the June 8, 2011 hearing**

Byers appeared with his attorney at a hearing on June 8, 2011 before the ALJ. (R. 40). When the ALJ asked Byers what problems began on January 7, 2009, he responded that his shoulder was killing him and he had severe pain and numbness in his fingers on his left side. (R. 44). He also testified that no particular incident was the source of his injury, but that he neglected to take care of problems as they cropped up over the years. (R. 44). Byers testified that he had been an iron worker since 1978. (R. 45). He stated that his duties at work involved connecting and putting together steel in new buildings, climbing the steel structures and setting the iron; or carrying and setting rebar for concrete structures and tying the rebar in with pliers and wire. (R. 45–46). His work required him to stand and walk all day, and to carry up to 100 pounds at a time. (R. 47–48).

Byers testified that in a normal day since the surgeries, he wakes up and makes coffee, then gets the paper and spends a half hour with the paper and morning news on T.V. (R. 48, 52). Then he goes to his barn to feed the chickens before returning to the house to rest and watch T.V. (R. 48). For the rest of the day, he might walk down to the pond and go fishing, then lie down for an hour, then watch more T.V., and maybe walk a little bit. (R. 48). Byers testified that he does not help around the house, and that he cooks for himself every now and then, but that his wife takes care of everything else. (R. 48). He testified that he no longer mows the lawn but that he might have in October 2009, he has no hobbies, and he does not play pool anymore and could not remember the last time he played. (R. 49). He testified that his friends may stop by the house to talk and have a beer or two, and go down to the pond to fish. (R. 50). Byers testified that he can drive himself and has access to a car, but that his wife usually drives. (R. 51). He drives

himself two to three times a week, but not more than needed. (R. 51). He usually only goes to the store to get his medication. (R. 51).

When asked about his problems during the day, Byers responded that his left hip and knee hurt, that his neck constantly hurts, and that his pain goes into his left shoulder. (R. 52). He also stated that he has tennis elbow on his right side, and he experiences numbness in his right hand if he does anything. (R. 53). He stated that his right side has bothered him since 2009, but he had carpal tunnel for a long time. (R. 53). When he was asked what sets off the pain, Byers replied that the pain was constant, that more walking or sitting makes the pain worse and that is why he sits for a while then has to get up and walk, but that if he walks or spends a half hour or more outside the pain hurts him and he has to go inside and sit down. (R. 53). He stated that his shoulder pain was set off just by moving it or putting it in a certain position while sitting down, and that more movement caused more pain. (R. 55).

Byers estimated that he could only walk one block before having to sit down for a few minutes. (R. 54). After walking a block he experiences serious pain in his knee and lower hip or back, and his neck is constantly bothering him. (R. 54). Byers testified that he could stand for fifteen to twenty minutes, and then sit for fifteen to thirty minutes before he had to stand up and move again. (R. 54). Byers stated that he could sit for twenty to thirty minutes at a time, and could sit longer in a more comfortable chair like a recliner. (R. 55). Byers stated that he could not raise his left arm overhead, could not raise it to shoulder level straight out in front of his body, but could raise it to mid-chest level straight out in front of him. (R. 55–56). He estimated that his range of motion had been limited in that manner for about a year and a half prior to the shoulder surgery. (R. 56). He stated that he could only pick up a pound with his left hand, and he gave examples of a T.V. remote control and a coffee mug as two things he could lift. (R. 56–57).

He stated that he is able to feed himself with silverware. (R. 57). Byers rated his shoulder pain at a seven or eight out of ten, all of the time, even with Hydrocodone once or twice a day. (R. 58). Byers also testified that he had surgery about six months prior to the hearing to remove a cyst from his left testicle, and that he still experienced pain from that. (R. 59).

When questioned by his attorney, Byers testified that he took Gabapentin for the C7 nerve that runs from his neck to his fingers. (R. 60). Byers testified that he was told he would need to take the drug for the rest of his life because "they couldn't find the problem." (R. 60). When asked if he suffers any side effects from Gabapentin, Byers responded that it makes him unable to think, concentrate, or remember things. (R. 60). Byers gave the example of setting an object down, going into another room, and then having to search for the object for a half hour upon returning to retrieve it. (R. 60).

C.    **Vocational Expert Testimony at the June 8, 2011 hearing**

Vocational expert Caroline Ward-Kniaz was present for the entire hearing on June 8, 2011. (R. 41–42, 62–76). Byers did not object to her qualifications. (R. 62). The VE testified that she reviewed the written information of record and heard Mr. Byers' testimony regarding his work history. (R. 62–63). She testified that Byers' previous occupation as an iron worker is a skilled position with a heavy exertional level. (R. 63). When asked which geographic region she would refer to, she answered "[t]he state of Indiana." (R. 63).

The ALJ presented the VE with a series of hypothetical individuals. The first individual was a male between the ages of 50 and 52 years, with a high school education; able to read, write, and use numbers; with the same prior work history as Byers; capacity to lift and carry up to twenty pounds occasionally, ten pounds frequently; may sit, stand, and walk respectively, with normal breaks, for up to six hours each in an eight hour day; may not climb ladders, ropes, or scaffolds, but may otherwise climb ramps or stairs, balance, stoop, kneel, crouch, and crawl on

no more than an occasional basis. (R. 63–64) The individual may not with the nondominant left hand, perform the task of feeling more than occasionally without limitations on grasping, handling, fingering, or pinching; could not work at a level above the shoulder or reach behind the back with the nondominant left arm. (R. 64). The VE testified that this individual would be unable to perform Byers' prior work, but that 20,000 unskilled, light or sedentary inspection jobs would exist for the hypothetical individual. (R. 65–67, 71). When the ALJ added a restriction that the individual could not work with his upper left extremity above mid-chest level the VE testified that the additional restriction would not affect the inspection jobs. (R. 67).

In the final hypothetical presented to the VE, in addition to the previous limitations, the individual did not have the capacity to recall, focus on, attend to, or carry out complex or detailed instructions, or the ability to perform complex or detailed tasks, but retained the ability to recall, focus on, attend to, and carry out simple, routine type instructions, as well as to focus on, attend to, and perform simple, routine tasks. (R. 75). The VE testified that such an individual would be unable to perform Byers' prior work, but would be able to perform the unskilled inspection jobs. (R. 75–76).

**D.    ALJ's November 25, 2011 Decision**

ALJ Karmgard issued his decision on November 25, 2011. At step 2, the ALJ found that Byers' severe impairments were: "degenerative disease of the cervical and lumbar spine and of the left acromioclavicular joint; left shoulder labral tear, left shoulder tendinopathy; left cubital tunnel syndrome; bilateral carpal tunnel syndrome; depression; and anxiety. (R. 27). At step three, the ALJ found that Byers had a mild restriction in activities of daily living; mild difficulties in social functioning; moderate difficulties regarding concentration, persistence, or pace; and no episodes of decompensation, so he did not meet or equal a Listing. (R. 28).

Before proceeding to step 4, the ALJ formulated Byers' RFC. In doing so, he recounted Byers' medical history of record and then discussed Byers' testimony at the hearing. (R. 33–34). He found that Byers had "not generally received the type of medical treatment one would expect for a totally disabled individual," since his surgeries were generally successful and his treatment was otherwise "routine and/or conservative in nature." (R. 35). The ALJ gave controlling weight to Dr. Balters as Byers' treating physician, and great weight to Dr. Sands, the reviewing physician. He also considered Dr. Larsen's opinion as to Byers' mental treatment, but ultimately found that Byers' limitations were more severe than Dr. Larsen found. Finally, the ALJ found that Byers' testimony at the hearing was not entirely credible, as the limitations he expressed exceeded those supported by the objective medical findings and were inconsistent with the extent of his activities of daily living, and because his testimony contradicted his prior reports to his physicians regarding his activities of daily living. The ALJ therefore concluded:

> [T]he claimant has the following residual functional capacity: lift and/or carry up to 20 pounds occasionally and 10 pounds frequently; may not, with the non-dominant left hand, perform the act of feeling more than occasionally, but there exists no limitation upon capacity to grasp, handle, finger or pinch; may not perform work at a level above shoulder level with the non-dominant left upper extremity (LUE); may not reach behind the back with the LUE; may sit, stand and walk, respectively and with normal breaks for up to 6 hours each in an 8 hour day; may not climb ladders, ropes or scaffolds; but may otherwise climb ramps and stairs, balance, stoop, kneel, crouch and crawl no more than occasionally; and does not possess the capacity to recall, focus upon, attend or carry out complex or detailed instructions or to perform complex or detailed tasks; but, retains the capacity to recall, focus upon, attend to and carry out simple routine instructions, and to focus upon, attend to and perform simple routine tasks.

(R. 28–29).

Relying on the VE's testimony, the ALJ concluded at step 4 that Byers was unable to perform his past relevant work. (R. 36). However, at step 5, he concluded that Byers was able to perform a significant number of jobs in the national economy, so Byers was not disabled. The ALJ therefore denied Byers' application for disability benefits. (R. 37).

## III. STANDARD OF REVIEW

This Court will affirm the Commissioner's findings of fact and denial of disability benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). This evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Thus, even if "reasonable minds could differ" about the disability status of the claimant, the Court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

In this substantial-evidence determination, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Nevertheless, the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an inadequate discussion of the issues. *Id.* Ultimately, while the ALJ is not required to address every piece of evidence or testimony presented, the ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). Further, conclusions of law are not entitled to deference; so, if the Commissioner commits an error of law, reversal is required without regard to the volume of evidence in support of the factual findings. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

## IV. ANALYSIS

Disability benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason

of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations create a five-step sequential evaluation process to be used in determining whether the claimant has established a disability. 20 C.F.R. § 404.1520(a)(4)(i)-(v); . The steps are used in the following order:

1. Whether the claimant is currently engaged in substantial gainful activity;

2. Whether the claimant has a medically severe impairment;

3. Whether the claimant's impairment meets or equals one listed in the regulations;

4. Whether the claimant can still perform relevant past work; and

5. Whether the claimant can perform other work in the community.

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

If the claimant is performing substantial gainful activity or does not have a severe medically determinable impairment, or a combination of impairments that is severe and meets the duration requirement, then the claimant will be found not disabled. 20 C.F.R. § 416.920(a)(4)(i)–(ii). At step three, if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations, disability is acknowledged by the Commissioner. 20 C.F.R. § 416.920(a)(4)(iii). However, if a Listing is not met or equaled, in between steps three and four, the ALJ must then assess the claimant's RFC, which is used to determine whether the claimant can perform his past work under step four and whether the claimant can perform other work in society at step five of the analysis. 20 C.F.R. § 416.920(e). The claimant has the initial burden of proof in steps one through four, while the burden shifts to the Commissioner in step five to show that there are a significant number of jobs

in the national economy that the claimant is capable of performing. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

Byers' arguments in favor of remand all focus on the ALJ's conclusions at step 5. Byers argues that the ALJ erred by not fully accounting for his limitations in concentration, persistence, and pace in the RFC and in the hypotheticals he posed to the vocational expert. Byers also argues that the ALJ erred in determining the extent of his physical limitations by improperly discounting his credibility and ignoring evidence as to the severity of his medical treatment. The Court finds that the ALJ erred as to the first argument, and that this error requires remand. The Court will also briefly address Byers' second argument to guide the ALJ's consideration on remand.

## A.     Byers' Concentration, Persistence, and Pace

As to the first issue, the Court finds that the ALJ erred by failing to account in the RFC, and in turn in the hypotheticals he posed to the VE, for the moderate limitations he found in Byers' ability to concentrate, persist, and maintain pace. The RFC measures an individual's capabilities in light of the limitations imposed by his impairments. *Young*, 362 F.3d at 1000; *see* 20 C.F.R. § 404.1545(a)(1); SSR 96–8p, 1996 WL 374184, at *3 (July 2, 1996). The RFC must account for all of a claimant's physical and mental limitations, regardless of whether the ALJ found those limitations to be severe or marked at an earlier stage of the analysis. *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). This requires a more detailed and itemized assessment than those performed at steps 2 and 3. 20 C.F.R. § 404.1520a(c); *see Kraus v. Colvin*, No. 12-C-0578, 2014 WL 1689717, at *14–15 (E.D. Wis. Apr. 29, 2014).

Here, the ALJ found at step 2 that Byers' depression and anxiety were among his severe impairments, and he found at step 3 that Byers had "moderate difficulties" with regard to "concentration, persistence or pace." (R. 27–28). The ALJ also noted at the conclusion of his step 3 analysis that the broad categories these limitations were grouped into did not necessarily

translate to the limitations that would apply to Byers' RFC, and that the more detailed RFC analysis encompassed the actual limitations these difficulties placed on Byers' capacity to work. (R. 28). The ALJ then proceeded to formulating Byers' RFC, and surveyed the evidence in the record before making findings as to the extent of Byers' limitations. (R. 28–36). In discussing the weight he gave to the opinion of Dr. Larsen, the reviewing psychologist, the ALJ stated that even though Dr. Larsen found only non-severe mental impairments, he found that "the claimant's mental impairments are severe, as the evidence shows that they result in *moderate limitations in his ability to concentrate, persist, and maintain pace*." (R. 35 (emphasis added)).

Having expressly found these limitations during his RFC analysis, the ALJ was required to account for those limitations in the RFC and in the hypotheticals he posed to the vocational expert. *Yurt v. Colvin*, No. 13-2964, 2014 WL 3362455, at *6 (7th Cir. July 10, 2014) ("As a general rule, both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record. This includes any deficiencies the claimant may have in concentration, persistence, or pace." (internal citations omitted)); *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010) (stating that an ALJ must "orient the VE to the totality of a claimant's limitations," and that "[a]mong the limitations the VE must consider are deficiencies of concentration, persistence and pace"); *Stewart v. Astrue*, 561 F.3d 679, 694 (7th Cir. 2009) ("When an ALJ poses a hypothetical question to a vocational expert, the question must include all limitations supported by medical evidence in the record. More specifically, the question must account for documented limitations of 'concentration, persistence or pace.'"). In attempting to translate Byers' mental limitations into the RFC, the ALJ stated that Byers "does not possess the capacity to recall, focus upon, attend, or carry out complex or detailed instructions or to perform complex or detailed tasks; but, retains

the capacity to recall, focus upon, attend to and carry out simple routine instructions, and to focus upon, attend to and perform simple routine tasks." (R. 29).

While this RFC is an improvement over merely limiting Byers to unskilled work, it still fails to account for Byers' mental limitations in a number of ways. First, as the Seventh Circuit has noted on multiple occasions, the complexity of a task is a poor measure of the extent that limitation in concentration, persistence, and pace will affect a claimant's ability to perform the task. *O'Connor-Spinner*, 627 F.3d at 620 ("In most cases, . . . employing terms like 'simple, repetitive tasks' on their own will not necessarily exclude form the VE's consideration those positions that present significant problems of concentration, persistence and pace."); *Craft v. Astrue*, 539 F.3d 668, 677 (7th Cir. 2008) (stating that "'[b]ecause response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job. A claimant's [mental] condition may make performance of an unskilled job as difficult as an objectively more demanding job.'" (quoting SSR 85–15) (alterations in original)). Here, though the ALJ found that Byers had "moderate limitations in his ability to concentrate, persist, and maintain pace," he offered no reasoning for why those limitations permit Byers to perform simple but not complex tasks. The example of his memory problems that Byers gave at the hearing was that he would set something down, walk to another room, and then have to look for a half hour to find the item when he came back, which has no apparent relation to the complexity of any task.

Second, even assuming that the complexity of the tasks appropriately accounted for Byers' limitations in concentration, the more fundamental problem with the RFC is that it fails to account for any limitations in persistence and pace. When a claimant has limitations in his ability to concentrate, persist, and maintain pace, "[t]he hypothetical must account for *both* the

complexity of the tasks *and* the claimant's ability to stick with a task over a sustained period."

*Warren v. Colvin*, No. 13-2921, 2014 WL 3409697, at *4 (7th Cir. July 15, 2014) (emphasis

added). "The ability to stick with a given task over a sustained period is not the same as the

ability to learn how to do tasks of a given complexity." *O'Connor-Spinner*, 627 F.3d at 620.

Likewise, the ability to complete a simple task is not necessarily equivalent to the ability to

complete that task at a pace sufficient to sustain employment. *See id.* Here, the RFC and the

hypotheticals to the VE did not account for Byers' ability to stick to the simple, routine tasks and

instructions over a sustained period and to perform the tasks at an adequate pace, so they failed

to account for all of Byers' limitations. *Yurt*, 2014 WL 3362455, at *4, * (finding that an RFC

under which the claimant could "remember and carry out unskilled tasks" and "attend to tasks

for sufficient periods of time to complete" failed to account for moderate difficulties in

concentration, persistence, and pace).

The Commissioner discounts these factors by arguing that no objective evidence in the

record supports a finding that Byers had a significantly limiting mental impairment. But not only

is this argument inaccurate, it overlooks the fact that the ALJ expressly found that Byers' mental

conditions were severe and that they resulted in moderate difficulties in his ability to concentrate,

persist, and maintain pace. (R. 35). Under the *Chenery* doctrine, the Court cannot reject those

findings in order to affirm the ALJ's decision, so the Commissioner's argument is misplaced.

Further, none of the exceptions to *O'Connor-Spinner's* general rule apply here. The ALJ

posed "a series of increasingly restrictive hypotheticals to the VE," so the Court cannot conclude

that the VE accounted for these limitations based on her review of the record or her presence

during Byers' testimony. *O'Connor-Spinner*, 627 F.3d at 619. In addition, the ALJ did not

mention Byers' underlying conditions to the VE such that the Court can conclude the VE

accounted for them in that way. The RFC and the hypotheticals did not exclude Byers from work that might trigger his limitations, either. Finally, no medical expert translated Byers' limitations into an RFC assessment upon which the ALJ could have relied. Therefore, because the RFC and the hypotheticals failed to account for Byers' limitations in concentration, persistence, and pace, the Court concludes that the ALJ failed "to orient the VE to the totality of a claimant's limitations," as required. *O'Connor-Spinner*, 627 F.3d at 618. Since the Commissioner bears the burden at this stage of the analysis, this error requires remand.

**B.      Byers' Other Claims**

Byers also argues that the ALJ committed several errors in determining the extent of his physical limitations. The Court does not find any reversible error in this aspect of the ALJ's analysis, but in order to guide the ALJ's consideration on remand, the Court will briefly address these arguments.

**1.      Byers' Medical Treatment**

Byers argues that the ALJ ignored evidence favorable to him, primarily by failing to acknowledge the side effects of his medications. In the penultimate sentence of a paragraph summarizing the course of Byers' medical treatment, the ALJ stated, "At the hearing, the claimant [did] not report any side effects from his medications." (R. 35). This was not correct, as Byers actually testified that he suffers side effects from gabapentin: "[I]t makes me so I can't think, can't concentrate. I can't remember stuff." (R. 60). Byers argues that the ALJ thus improperly ignored evidence favorable to him, requiring remand.

Though the Court encourages the ALJ to clarify this issue on remand, there are several reasons that this would not be reversible error on its own. First, the ALJ still acknowledged these effects, he just attributed them to a different source. In discussing Byers' testimony at the hearing, the ALJ noted that Byers had two cysts removed from his left testicle and that he still

experienced discomfort. The ALJ then stated, "When [Byers] was asked if he takes medications for this, he said, 'Cannot remember stuff, cannot think.'" (R. 34). Thus, while it appears that the ALJ erroneously attributed these symptoms to Byers' testicular condition instead of to the medication Byers took for his back, he did not ignore the side-effects of Byers' medications, he simply mis-categorized them. Byers has not articulated any reason for attaching significance to an error of that nature, or for concluding that the relevance of these effects was their source and not the impact they had on his ability to work, so this would not be a basis for remand.

Second, the ALJ accounted for these effects in his findings as to Byers' mental limitations. Even though the reviewing psychologist found that Byers had only mild limitations in his concentration, persistence, and pace, the ALJ found that Byers had moderate limitations in those areas. Byers has not argued that his limitations were actually more than moderate in those areas (just that the ALJ failed to account for them in the RFC, as discussed above), so any error in this respect would be harmless.

Byers also argues that the ALJ failed to mention that Byers underwent physical therapy, takes multiple medications, and has undergone cervical spinal injections. This argument is factually unsupported, though, as the ALJ acknowledged each of those facts in his RFC analysis. (R. 29, 30, 32, 34). Further, the ALJ's findings that Byers had not generally received the type of medical treatment one would expect for a totally disabled individual, and that his treatment with Dr. Arbuckle "has been essentially routine and/or conservative in nature," are supported by substantial evidence, so the ALJ's findings on this topic are neither substantively nor procedurally flawed.

## 2.      Byers' Activities of Daily Living

Byers briefly argues that the ALJ improperly cited his activities of daily living to support the conclusion that he was able to work, but this argument misreads the ALJ's decision. Byers is

correct in arguing that ALJs must be wary of relying on a claimant's activities of daily living as a basis for a conclusion that the claimant is able to hold down a job outside the home. *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006). Here, however, the ALJ did not use Byers' activities of daily living in this manner. Rather, he found that Byers' testimony at the hearing was not entirely credible, in part because the physical limitations he testified to were inconsistent with the physical activities he engaged in every day, such as walking to a pond and going fishing. The ALJ further cited to contradictions between the activities of daily living that Byers reported at the hearing and those that he reported to the consulting physicians, and he cited three separate examples of these contradictions. Thus, the ALJ did not err in considering Byers' activities of daily living, and the Court cannot conclude that the ALJ's credibility determination was patently wrong, such as would require reversal.

### 3. The State Agency Consultants' Credibility Opinions

Finally, Byers argues that the ALJ was required to explain the weight he gave to the opinions of State agency consultants Dr. Sands and Dr. Larsen regarding Byers' credibility. (R. 353, 341). Dr. Sands and Dr. Larsen each reviewed Byers' medical records and completed assessments of the severity of his conditions and the extent of his limitations—Dr. Sands as to his physical limitations and Dr. Larsen as to his mental limitations. In their reports, both Dr. Sands and Dr. Larsen stated that they found Byers' statements about his symptoms were credible. Byers asserts that the ALJ erred by not specifically addressing those findings, but the Court disagrees.

First, the ALJ was not required to discuss Dr. Sands' opinion at all. Under Social Security Ruling 96-7p, an ALJ must explain the weight given to the opinion of a State agency consultant's opinion regarding the credibility of the claimant's statements about his symptoms. SSR 96-7p, 61 Fed. Reg. 34483, 34488 (July 2, 1996). However, the ALJ is only required to

"consider and weigh this opinion of a nonexamining source *under the applicable rules* in 20 C.F.R. [§] 404.1527." *Id.* (emphasis added). Under those rules, the ALJ must explain the weight he gave to the opinions of the consultants "[u]nless a treating source's opinion is given controlling weight." 20 C.F.R. § 404.1527(e)(2)(ii). Here, the ALJ gave controlling weight to Dr. Baltera's opinions as to Byers' physical limitations, and Byers does not object to that decision. Thus, the ALJ was not required to explain the weight he gave to Dr. Sands' opinions, including those on Byers' credibility. *See* 20 C.F.R. § 404.1527(c)(2), (e)(2)(ii); SSR 96-7p, at *8.

Second, the physicians' opinions about Byers' credibility were not relevant to the ALJ's findings, as the only subjective complaints that the ALJ found were not entirely credible were the ones Byers expressed at the hearing, while the only complaints as to which the physicians expressed opinions were those contained in Byers' medical records. The reviewing physicians based their opinions only on a review of Byers' medical records, and their credibility assessments merely indicated that Byers' reports of his symptoms, as contained in those records, were credible. The ALJ implicitly accepted those credibility assessments by adopting the physical limitations expressed by Dr. Sands, and by making findings even more favorable to Byers than were Dr. Larsen's.[3] However, those physicians were not present for Byers' testimony before the ALJ, and they offered no opinion as to the limitations he expressed there, which were more severe than his prior complaints that were noted in the record. Thus, for the reviewing physicians' opinions to have had any relevance to the credibility of Byers' testimony at the

---

[3] In some instances, adopting a reviewing physician's opinions as to the severity of a claimant's limitations may not be equivalent to accepting the physician's credibility assessment, such as where the physician's credibility assessment conflicts with the physician's own evaluation of the severity of the claimant's limitations. *Mrskos v. Colvin*, No. 2:12-cv-255, 2014 WL 1319460, at *8 (N.D. Ind. Mar. 31, 2014). However, that is not the case here, as the complaints that the reviewing physicians found credible were consistent with those physicians' opinions as to Byers' limitations.

hearing, they essentially would have had to be opinions as to his character for truthfulness. That was not the case (and it likely would have been inappropriate for the reviewing physicians to opine on that topic), so the ALJ did not err by not addressing those opinions in considering the credibility of Byers' testimony at the hearing.

## V. CONCLUSION

Byers' motion for remand is **GRANTED**. [DE 1]. Accordingly, the Court **REMANDS** this case to the Commissioner for further proceedings consistent with this order.

SO ORDERED.

ENTERED: July 31, 2014

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court